**BLACKLIGHT POWER, INC., Plaintiff–Appellant,**

**v.**

**James E. ROGAN, Director, Patent and Trademark Office, Defendant–Appellee.**

**No. 00–1530.**

United States Court of Appeals, Federal Circuit.

DECIDED: June 28, 2002.

[redacted]

Donald R. Dunner, Finnegan, Henderson, Farabow, Garrett & Dunner, L.L.P., of Washington, DC, argued for plaintiff-appellant. With him on the brief was J. Michael Jakes. Of counsel on the brief were Michael H. Selter, and Jeffrey S. Melcher, Manelli, Denison & Selter, PLLC, of Washington, DC. Also of counsel on the brief was Jeffrey A. Simenauer, of Washington, DC.

John M. Whealan, Solicitor, United States Patent and Trademark Office, of Arlington, VA, argued for defendant-appellee. With him on the brief were Marshall S. Honeyman, and Stephen Walsh. Of counsel was Henry G. Sawtelle, Attorney, Office of the Solicitor.

Before NEWMAN, CLEVENGER, and SCHALL, Circuit Judges.

PAULINE NEWMAN, Circuit Judge.

The question on appeal is whether the Director of the Patent and Trademark Office had the authority summarily to withdraw BlackLight's patent application from issue, following Notice of Allowance, payment of the issue fee and notification of the issue date, and with publication of the drawing and claim in the Official Gazette. We conclude that such withdrawal was within the scope of the Director's authority and responsibility for performing the mission of the Patent and Trademark Office, when viewed in light of the unusual circumstances of this case. The district

court's judgment is affirmed.[1]

## BACKGROUND

BlackLight Power Inc. conducts research into new sources of energy. BlackLight is the owner of United States Patent Application No. 09/009,294 entitled "Hydride Compounds." As described in BlackLight's brief, the inventions claimed in this and several related patent applications and an issued patent are directed to new energy technology derived from hydrogen compounds, and new compositions including conductive magnetic plastics and corrosion-resistant high-strength coatings.

During examination of the '294 application, the examiner initially rejected the claims on various grounds including operability under 35 U.S.C. § 101 and enablement and definiteness under § 112. After further prosecution including discussions of experimental results and the submission of samples, the examiner withdrew the rejection and allowed the claims. A Notice of Allowance was issued on October 18, 1999, the issue fee was paid, and issuance was noticed for February 29, 2000.

Another BlackLight patent application, entitled "Lower–Energy Hydrogen Methods and Structures," issued as United States Patent No. 6,024,935 on February 15, 2000. Shortly thereafter, prompted by an outside inquiry, the Director of the Group that had examined these applications was made aware of both the '935 patent and the imminent issuance of the '294 application. By Declaration filed in the district court, Group Director Kepplinger stated that upon reading the patent her "main concern was the proposition that the applicant was claiming the electron going to a lower orbital in a fashion that I knew was contrary to the known laws of physics and chemistry." Director Kepplinger believed that the '935 patent and the '294 application were directed to similar subject matter, and contacted Robert Spar, Director of the Special Program Law Office in the Office of the Deputy Assistant Commissioner for Patents. Director Spar stated by Declaration that Director Kepplinger expressed concern that the '294 application "possibly had serious and substantial patentability problems and asked me to withdraw it from issue for further review."

On February 17, 2000 a Notice was issued to BlackLight, stating that the '294 application "is being withdrawn from issue pursuant to 37 C.F.R. § 1.313 ... to permit reopening of prosecution ... [as] requested by the Director, Special Program Law Office." It is undisputed that no one involved in the withdrawal had reviewed the '294 patent application before issuance of the Notice; at the argument of this appeal the PTO Solicitor stated that the application was not available for review because the file was in Pennsylvania for printing of the patent document.

BlackLight's attorneys made prompt inquiries about the withdrawal. The PTO treated the inquiries as a petition to the Commissioner requesting reversal of the withdrawal. On March 22, 2000 the petition was denied by decision of Assistant Deputy Commissioner Kunin. The decision stated that "[t]he PTO has an obligation to issue patents that meet the statutory requirements for patentability," and concluded that Director Kepplinger did not act improperly in obtaining withdrawal of the '294 application for further examination. The decision referred to Director Kepplinger's concern about the correctness of the scientific theory set forth in the issued '935 patent, described in the decision as "the discovery that energy was

---

1. *Blacklight Power, Inc. v. Dickinson,* 109 F.Supp.2d 44, 55 USPQ2d 1812 (D.D.C.2000).

released by stimulating hydrogen atoms to relax, and, in so doing, to shrink to smaller radii, and to also attain energy levels below their 'ground state' according to a 'novel atomic model,'" and Director Kepplinger's belief that the '294 application was based on the same theory. The decision stated that Commissioner Kunin's inspection of the '294 application "reveals that this invention is asserted [sic] to matters containing fractional quantum numbers. Such fractional quantum numbers do not conform to the known laws of physics and chemistry." The decision did not further discuss patentability, but stated that the application would be returned to examination.

Meanwhile, on March 1, 2000 Black-Light filed suit against the PTO Commissioner (now denominated "Director") in the United States District Court for the District of Columbia, charging that the withdrawal was contrary to law and in violation of the Administrative Procedure Act, 5 U.S.C. § 701 et seq. BlackLight argued that 35 U.S.C. § 151 compels issuance when the issue fee has been paid:

35 U.S.C. § 151. If it appears that applicant is entitled to a patent under the law, a written notice of allowance of the application shall be given or mailed to the applicant. The notice shall specify a sum, constituting the issue fee or a portion thereof, which shall be paid within three months thereafter.

Upon payment of this sum the patent shall issue, but if payment is not timely made, the application shall be regarded as abandoned.

BlackLight argued that § 151 does not allow for withdrawal of an application by the PTO after the issue fee has been paid, and that the PTO officials exceeded their authority when they withdrew the '294 application.

BlackLight also argued that 37 C.F.R. § 1.313, the regulation cited by the PTO in withdrawing the application, violates the mandatory statutory language of § 151:

37 C.F.R. § 1.313

(a). Application may be withdrawn from issue for further action at the initiative of the Office or upon petition by the applicant....

(b). Once the issue fee has been paid, the Office will not withdraw the application from issue at its own initiative for any reason except:

(1) A mistake on the part of the Office;

(2) A violation of § 1.56 or illegality in the application;

(3) Unpatentability of one or more claims; or

(4) For interference.

BlackLight stated that even if some form of withdrawal authority were deemed to exist as set forth in § 1.313(b), the PTO exercised that authority in an arbitrary and capricious manner, for there had been no determination of unpatentability of any of the claims allowed in the '294 application.

The district court held that the PTO's interpretation of its statutory authority is entitled to deference in accordance with *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–44, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), and that the district court had so held in *Harley v. Lehman,* 981 F.Supp. 9 (D.D.C. 1997). The court concluded that the PTO's action in withdrawing from issue the '294 application (and subsequently four related applications) was "reasonable," reasoning that 37 C.F.R. § 1.313(b) "functions as a last-chance procedural measure to observe the PTO's central mandate of issuing viable patents," and sustained the action of the PTO.

## DISCUSSION

■ BlackLight argues that 35 U.S.C. § 151 commands the PTO to issue the patent upon payment of the issue fee, pointing out that the second paragraph of § 151 states that "the patent shall issue" upon payment of the fee. The PTO responds that § 151 starts with the conditional clause: "If it appears that applicant is entitled to a patent under the law. . . ."

■ We agree with the PTO that while the words "shall issue" indeed impose a duty, the preface to § 151 places a condition on that duty. This preface conditions not only the issuance of the notice of allowance but also the ensuing steps of § 151. Statutory interpretation is "not guided by a single sentence or member of a sentence, but look[s] to the provisions of the whole law, and to its object and policy." *Dole v. United Steelworkers of Am.*, 494 U.S. 26, 35, 110 S.Ct. 929, 108 L.Ed.2d 23 (1990) (internal citations omitted).

■ Both paragraphs of § 151 together define the obligations and procedures of the notice of allowance and issuance. Section 151 does not prohibit the Office from interrupting the sequence if the condition set forth in the opening clause is reasonably believed not to have been met. Correct statutory interpretation is that which is "most harmonious with [the statutory] scheme and with the general purposes that Congress manifested." *Commissioner v. Engle*, 464 U.S. 206, 217, 104 S.Ct. 597, 78 L.Ed.2d 420 (1984) (internal citations omitted). We conclude that § 151 does not prohibit withdrawal by the PTO of a patent application after the issue fee has been paid.

BlackLight states that even if the PTO has statutory authority to withdraw applications, such withdrawal is limited to the grounds specified in the implementing rule, 37 C.F.R. § 1.313(b). BlackLight argues that none of these grounds applied, and specifically that ground (3), "unpatentability of one or more claims," requires a determination of unpatentability before the provision can be invoked, and not a mere hint or suspicion. The district court held that § 1.313(b)(3) did not require a "final pronouncement" of unpatentability at the time of withdrawal.

■ The object and policy of the patent law require issuance of valid patents. This responsibility, and the mission of the PTO, require authority to implement § 151 by taking extraordinary action to withdraw a patent from issue when a responsible PTO official reasonably believes that the subject matter may be unpatentable and that the application may have been allowed in error. The complexity of the examination process, and the potential for error in any human activity, weigh on the side of according the PTO latitude to withdraw an application from issue without a final determination of unpatentability when the exigencies of time do not allow for such determination.

The decision to withdraw the application was made by PTO officials acting within their authority and in fulfillment of their obligation to assure that patents are properly examined, and valid. In *Skidmore v. Swift & Co.*, 323 U.S. 134, 139–40, 65 S.Ct. 161, 89 L.Ed. 124 (1944) the Court observed that agency actions are entitled to judicial respect when they are reasonably taken and in accordance with the "specialized experience" of agency officials and the "validity of its reasoning." Director Kepplinger, who is presumed to be knowledgeable in the fields of physics and chemistry, upon review of the '935 patent and being generally advised of the scope of the '294 application, reasonably believed that the '294 application had not been adequately examined, and took the only available action to return the '294 application

**1274**

to examination. That summary action was reasonably within the scope of the agency's authority and was not an arbitrary or capricious action. In *Baltimore & Ohio Railroad Co. v. United States*, 386 U.S. 372, 421, 87 S.Ct. 1100, 18 L.Ed.2d 159 (1967) Justice Brennan remarked, in concurrence, on "the importance of leaving great flexibility with the agency to deal with emergency situations" in order to avoid harming that which the agency oversees. Such action must of course be reasonable under the circumstances and rare in occurrence, lest the emergency become the rule. But when necessary in order to fulfill the PTO's mission, with safeguards to the interests of the applicant including fair and expeditious further examination, we agree with the district court that the action taken is a permissible implementation of the statute and regulation.

The PTO's responsibility for issuing sound and reliable patents is critical to the nation. It has not been shown that the PTO's exigent action was unreasonable in view of the scientific concerns of the Group Director and the imminent issuance of the patent. In *In re Alappat*, 33 F.3d 1526, 1535, 31 USPQ2d 1545, 1550 (Fed.Cir. 1994) (*en banc*) this court sustained extraordinary action when the Commissioner in good faith believed that such action was required to ensure the issuance of valid patents, observing that "the Commissioner has an obligation to refuse to grant a patent if he believes that doing so would be contrary to law."

The judgment of the district court is affirmed.

No costs.

*AFFIRMED.*